REGINALD TERRELL, SB # 127874
THE TERRELL LAW GROUP
P. O BOX 13315, PMB # 148
OAKLAND, CA 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616

DONALD AMAMGBO
AMAMGBO & ASSOCIATES
6167 BRISTOL PARKWAY, #325
CULVER CITY, CA 90230
Telephone: 310-337-1134
Facsimile: 310-337-1157

SYDNEY J. HALL, ESQ., SBN: SB# 158151
LAW OFFICES OF SYDNEY J. HALL
1308 Bayshore Highway, Suite 220
Burlingame, CA 94010
Telephone: (650) 342-1830
Facsimile: (650) 342-6344

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE PELOBELLO, individually and on behalf of all others similar situated, <br><br> Plaintiff, <br><br> vs. <br><br> The Quaker Oats Company, <br><br> Defendant. <br> _____/ | No. C11-00093 EMC <br><br> CIVIL - CLASS ACTION <br><br> JURY TRIAL DEMANDED |

Plaintiff Elaine Pelobello, on behalf of herself, all others similarly situated, and the general public, by and through undersigned counsel, hereby sue Defendant The Quaker Oats Company ("Quaker") and, upon information and belief and investigation of counsel, allege as follows:

**JURISDICTION**

1. This court has original jurisdiction over this action under 28 U.S.C. § 1331 and 15

-1-

C:\Documents and Settings Quaker Oats Litigation
COMPLAINT

1  U.S.C. § 1121.

2      2.    This court also has original jurisdiction under 28 U.S.C. § 1332 (d) (2) (The class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs. Further, more than two-thirds of the class members reside in states other than the state of which Defendant is a citizen.

## VENUE

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff reside in and suffered injuries as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, and Defendant (1) is authorized to conduct business in this district and has intentionally availed itself of the laws and markets of this district through the promotion, marketing, distribution, and sale of its products in this district; (2) resides in this district; and (3) is subject to personal jurisdiction in this district

## INTRODUCTION

4. Plaintiff Elaine Pelobello repeatedly purchased packaged food products made by Quaker in California during the class period defined herein. Quaker falsely markets its products as healthful despite the fact that they have dangerous levels of artificial trans-fat, a toxic food additive banned in many parts of the world.

5. Plaintiff seeks an order that compels Quaker to (1) cease marketing its products using the misleading tactics complained of herein, (2) conduct a corrective advertising campaign, (3) restore the amounts by which Quaker was unjustly enriched, (4) destroy all misleading and deceptive materials and products, and (5) compensate Plaintiff and the Plaintiff class for purchasing and consuming these products.

## SUMMARY OF THE STRONG EVIDENCE OF HEALTH DANGERS OF ARTIFICIAL TRANS-FAT

**Artificial trans-fat is a manufactured food product whose basic chemical structure is different from natural fat molecules.**

8. Trans-fat is naturally found in trace amounts in foods derived from ruminant animals, primarily in red meat.

9. Also known as vaccenic acid, natural trans-fat has never been linked to any

-2-

negative health effect in human beings and is chemically different than artificial trans-fat.

10. Initial studies on rats seem to indicate that consumption of vaccenic acid is beneficial to health.

11. Artificial trans-fat is manufactured in an industrial process called hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400 degrees Fahrenheit in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.

12. Nearly all the trans-fat in the U.S. diet is the artificial fat present in partially hydrogenated vegetable oil ("PHVO").

13. PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. Trans-fat molecules chemically differ from the natural fat molecules in other food products, as shown in the illustrations that follow.

14. Natural fat, except the trace amounts of natural trans-fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side of the carbon chain ("cis fat"). Trans-fat, in contrast, has carbon double bonds with the hydrogen atoms on opposite sides of the carbon chain.

15. PHVO was initially a "wonder product" attractive to the packaged food industry because it combines the low cost unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like cis fat, PHVO is manufactured from lower-cost legumes, while saturated fat is derived from relatively expensive animal and tropical plant sources.

16. Like natural saturated fat, PHVO has a long shelf life, physical solidity, and flavor stability. The industrial process that adds hydrogen ions to normal vegetable oil improves food texture and permits food products to withstand heavy mechanical processing and high temperatures. Given its versatility, PHVO was recently used in 40% of processed packaged foods.

17. Artificial trans-fat does not exist in nature, and the human body has not evolved to digest it. The same unusual and unnatural chemical structure that gives artificial trans-fat

properties attractive from an industrial perspective makes it highly toxic to human health.

## Trans-fat causes cardiovascular disease, type 2 diabetes, and cancer
### Heart Disease

18. In a joint Dietary Guidelines Advisory Committee Report, the U.S. Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans-fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."

19. Food products with trans-fat harm the heart by "rais[ing] a protective form of serum cholesterol (HDL cholesterol)."

20. The American Heart Association notes **"trans-fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans-fat increases your risk of developing heart disease."**

21. After an extensive evaluation of the scientific literature on the trans-fat/Coronary Heart Disease connection, the FDA concluded that:

> Based on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations… the available evidence for an adverse relationship between trans-fat intake and CHD [Coronary Heart Disease] risk is strong.

22. Trans-fat raises the risk of CHD more than any other known nutritive product.

23. Removing 2% of daily calories from trans-fat from the American diet "would prevent approximately 30,000 premature coronary deaths per year and epidemiologic evidence suggest this number is closer to 100,000 premature deaths annually.

24. A study on the impact of trans-fatty acids on heart health provides evidence that:

> [E]ven the lower estimates from the effects [of PHVO] on blood lipids would suggest that more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable fat. Furthermore, the number of attributable cases of nonfatal coronary heart disease will be even larger.

25. Since "the adverse effect of trans-fatty acids is stronger than that of saturated fatty acids," saturated fat consumption would need to be reduced by 10% of caloric intake to have the same impact.

26. "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans-fat."

27. By raising LDL levels and lowering HDL levels, trans-fat causes a wide variety of dangerous heart conditions, including low flow-mediated vasodilatation, coronary artery disease, and primary cardiac arrest.

28. After conducting a crossover diet trial, Danish researchers determined that healthy men and women who maintained a high-trans-fat diet had 21% lower protective HDL levels and 29 % lower flow-mediated vasodilatation ("FMD") than those on a high-saturated fat diet. Since FMD measures the percent increase between the diameter of the artery at ordinary and at maximum dilation, low FMD is "a risk marker of coronary heart disease."

29. Australian researchers observed that heart attack patients posses elevated amounts of trans-fat in their adipose tissue, strongly linking heart disease with long-term consumption of trans-fat.

30. By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected control patients and comparing the top fifth with the bottom fifth of participants by trans-fat intake, another study published in the American Heart Association's *Circulation* found that the largest consumers of trans-fat have three times the risk of suffering cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.

**Diabetes**

31. Artificial trans-fat causes type 2 diabetes.

32. A 14-year study of 84,204 women found that for every 2% increase in energy intake from trans-fat, the relative risk of type 2 diabetes was 1.39. In other words, each 2% of calories from artificial trans-fat increase the risk of type 2 diabetes by 39%.

**Cancer**

33. Trans-fat is a known carcinogen shown to cause breast, prostate, and colorectal

-5-

cancer.

34. A 13-year study of 19,934 French women showed that 75% more women contracted breast cancer in the highest quintile of trans-fat consumption than did those in the lowest.

35. In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of trans-fat intake had over a 100% greater risk of developing prostate cancer than the doctors in the lowest quintile.

36. A study of 1,012 American males observing trans-fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.

37. A 600-person study found an 86% greater risk of colorectal cancer in the highest trans-fat consumption quartile.

38. A 2,910-person study found "trans-mono-saturated fatty acids…were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."

39. The serious conditions caused by trans-fat consumption only occur from artificial trans-fat, not the trace natural fat found in ruminant sources:

> Of four prospective studies evaluating the relation between the intake of trans-fatty acids from ruminants and the risk of CHD, none identified a significant positive association, whereas three identified a trend toward an inverse association. … [T]he sum of the current evidence suggests that the public health implications of consuming trans-fats from ruminant products are relatively limited.

**The grave, concrete risks of artificial trans-fat consumption far outweigh any conceivable benefits of Quaker's conduct.**

40. There is no health benefit to artificial trans-fat consumption and "no safe level" of artificial trans-fat intake.

41. According to the established consensus of the scientific community, consumers

-6-

should keep their consumption of trans-fat "as low and possible."

42. As Dariush Mozaffarian, M.D., notes in the New England Journal of Medicine:

> [F]rom a nutritional standpoint, the consumption of trans-fatty acids results in considerable potential harm but no apparent benefit. …Thus, complete or near-complete avoidance of industrially produced trans-fat – a consumption of less than 0.5% of the total energy intake – may be necessary to avoid adverse effects and would be prudent to minimize health risks.

**Trans-fat is so inherently dangerous that it is being banned in an increasing number of American states and European countries.**

43. In 2008, California became the first state to ban all restaurant food with artificial trans-fat, a law affecting approximately 88,000 eating establishments. Trans-fats are now banned in restaurants as of January 1, 2010 and will be removed from retailers starting January 1, 2011.

44. New York City banned all trans-fat in its 20,000 food establishments in 2006. Similar laws exist in Philadelphia, Baltimore, Stamford, Connecticut, and Montgomery County, Maryland.

45. A 2004 Danish law restricted all foods to fewer than 2% of calories from trans-fat. Switzerland made the same restriction in 2008.

46. After conducting a surveillance study of Denmark's trans-fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."

47. In 2006, a trans-fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans-fat content at 2% of calories for tub margarines and spreads and 5% for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.

## SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE ACTS

48. Inspection of the ingredient panel of Quaker Instant Oatmeal (Figure 1) reveals that all four of the flavors contain partially hydrogenated soybean oil, a form of artificial trans-

1 fat.

2 49. Quaker also labels Quaker Instant Oatmeal with images of oats and nuts. The obvious implication of this is that Quaker Instant Oatmeal is, like oats and nuts, part of a healthy lifestyle. In fact, Quaker Instant Oatmeal contains artificial trans-fat, which renders it unfit for human consumption.

50. **False and misleading "heart healthy" claim:** Quaker labels its Instant Oatmeal as "heart healthy." Quaker Instant Oatmeal however, contains artificial trans-fat which, far from "heart healthy," causes heart disease, cancer and type-2 diabetes.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action on behalf of herself and all others similarly situated (the "class") in accordance with Rule 23 of the Federal Rules of Civil Procedure.

52. The class is defined as:

All persons (excluding officers, directors, and employees of Quaker) who purchased, on or after January 1, 2000, one or more Quaker Instant Oatmeal products containing artificial trans-fat for their own use rather than resale or distribution.

53. Question of law and fact common to Plaintiff and the class include:

(a) Whether Quaker contributed to, committed, and/or is responsible for the conduct alleges herein;

(b) Whether Quaker's conduct constitutes the violations of law alleged herein;

(c) Whether Quaker acted willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein; and

(d) Whether class members are entitled to compensatory, injunctive, and other equitable relief.

54. By purchasing and/or using these products, all class members were subjected to the same wrongful conduct.

55. Absent these material deceptions, misstatements, and omissions, Plaintiff and other class members would not have purchased these Quaker products.

56. Plaintiff's claims are typical of the class's claims. Plaintiff will fairly and

adequately protect the interests of the class, and have retained counsel competent and experienced in class litigation.

57. The class is sufficiently numerous, as it includes hundreds of thousands of individuals who purchased Quaker Instant Oatmeal throughout the United States.

58. Class representation is superior to other options for the resolution of the controversy. The relief sought for each class member is small. Absent the availability of class action procedures, it would be infeasible for class members to redress the wrongs done to them.

59. Quaker has acted on grounds applicable to the class, thereby making appropriate final injunctive relief or declaratory relief concerning the class as a whole.

60. Questions of law and fact common to the class predominate over any questions affecting only individual members.

**Quaker fraudulently concealed the health risks of consuming its products.**

61. Quaker has tolled any applicable statute of limitations by affirmatively concealing and publically misrepresenting its violations of law as described herein. A reasonable consumer would have relied on the deceptive and false claims made on the packaging of Quaker products, and through the exercise of reasonable diligence would not have discovered the violations alleged herein because Quaker actively and purposefully concealed the truth regarding its products.

**FIRST CAUSE OF ACTION**
**False Advertising under the Lanham Act, 16 U.S.C. § 1125 et seq.**

62. Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

63. Quaker has made and distributed, in interstate commerce and in this District, products that make false or misleading statements of fact regarding their content. All of the products described herein were placed into interstate commerce by Quaker and sold throughout the country and this District.

64. These products contain on their labels actual misstatements and/or misleading statements and failures to disclose, including, among others, the statement that such products are "heart healthy", meaning "… may help reduce the risk of heart disease."

65. These false and/or misleading statements and omissions actually deceive, or have a tendency to deceive, any reasonable consumer.

66. Plaintiff seeks an order directing Quaker to destroy all misleading and deceptive advertising materials and products in accordance with 15 U.S.C. § 1118.

67. Plaintiff further seeks an injunction under 15 U.S.C. § 1116 restraining Quaker, its agents, employees, representatives, and all persons acting in concert with Quaker from engaging in further acts of false advertising, and ordering removal of all Quaker's false advertisements and products possessing misleading statements or omissions of fact.

## SECOND CAUSE OF ACTION
**Violations of the California Unfair Competition Law, Bus. & Prof. Code § 17200 et seq., and the Common Law of Unfair Competition**

68. Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

69. Bus. & Prof. Code § 17200 prohibits an "unlawful, unfair or fraudulent business act or practice."

70. The act, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "unlawful" business acts and practices in that Quaker's conduct violates the Lanham Act, the False Advertising Law and the Consumer Legal Remedies Act.

71. The act, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "unfair" business acts and practices in that Quaker's conduct is immoral, unscrupulous, and offends public policy. Further, the gravity of Quaker's conduct outweighs any conceivable benefit of such conduct.

72. The act, omissions, misrepresentations, practices, and non-disclosures of Quaker as alleged herein constitute "fraudulent" business acts and practices in that Quaker's conduct has a tendency to deceive the class and the general public.

73. By violating the California Unfair Competition Law, Quaker also violated the common law of unfair competition.

74. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Quaker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and

practices and to commerce a corrective advertising campaign.

75. Plaintiff further seeks an order for the disgorgement and restitution of all monies from the sale of these products, which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

**THIRD CAUSE OF ACTION**
**Violations of the California False Advertising Law,**
**Bus. & Prof. Code § 17500 et seq.**

76. Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

77. In violation of Bus. & Prof. Code § 17500 *et seq.,* the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of the products without the knowledge that these products contained toxic artificial trans-fat.

78. Quaker knew and reasonably should have known that the labels on these products were untrue and/or misleading.

79. As a result, Plaintiff, the class, and the general public are entitled to injunctive and equitable relief, restitution, and on order for the disgorgement of the funds by which Quaker was unjustly enriched.

**FOURTH CAUSE OF ACTION**
**Violations of the Consumer Legal Remedies Act,**
**Civ. Code § 1750 et seq.**

80. Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

81. The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or service for personal, family, or household purposes.

82. The Quaker's policies, acts, and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

(a)   § 1770(a)(5): Representing that goods have characteristics, uses, or benefits which they do not have.

(b)     § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.

(c)     § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

(d)     § 1770(a)(16): Representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

83.    As a result, Plaintiff and the class have suffered irreparable harm and are entitled to injunctive relief and restitution.

84.    In compliance with Civ. Code § 1782, Plaintiffs have given written notice to Quaker of their claims.

## FIFTH CAUSE OF ACTION
**Breach of Implied Warranty of Fitness for Purpose**

85.    Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

86.    Plaintiff and the other class members sought *Heart Healthy* products that were safe, healthy and effective. In doing so, Plaintiff and other class members relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose, an on or about that time, Defendant sold the product to Plaintiff and other class members.

87.    By its representations regarding the reputable nature of its companies and related entities, and by its promotion and marketing of the product, Defendant warranted that the product was safe and healthy, enhancing cardio logical fitness with heart healthy properties. Plaintiff and class members bought the product from Defendant, relying on Defendant's skill and judgment.

88.    However, Defendant's product is not safe or healthy for use by consumers, has not qualified for marketing as drug as set forth above, and is not fit for human consumption, also as set forth in details above.

89.    At the time of sale, Defendant had reason to know the particular purpose for which the goods were required, and that Plaintiff and class members were relying on Defendant's skill and judgment to select and furnish suitable and safe goods, so that there was an implied warranty that the goods were fit for this purpose.

C:\Documents and Settings Quaker Oats Litigation
COMPLAINT

90. However, Defendant breached the warranty implied at the time of sale in that Plaintiff and class members did not receive suitable goods, and the goods were not fit for the particular purpose for which they were made, as set forth above.

91. As proximate result of this breach of warranty by Defendant, Plaintiff and class members have suffered actual damages in an amount to be determined at trial in that they were induced to a product they would not have purchased had they known the true facts about, and have spent money on a product that is not what it was represented to be, and that lacks the value Defendant represented the product had, which was reflected in the purchase price.

## SIXTH CAUSE OF ACTION
**Breach of Express Warranty**

92. Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

93. Plaintiff is informed and believes and thereon alleges that Defendant made different express warranties, including, but not limited to, express warranties that the product would be free from defects, would promote healthy cardio and heart healthy enhancement, and would be safe for the consumer using it.

94. Plaintiff alleges on information and belief that Defendant has marketed the product for use by consumers as set forth above, but that: the product is not safe; Defendant has failed to adequately warn of the dangers and health risks associated with use of the product; and that the product has not met with requirements for marketing the product.

95. These acts constitute breaches of all applicable express and implied warranties as alleged in this Complaint, based on all laws that support the breach of express warranty claims by Plaintiff and other class members. These laws include, but are not limited to, the common law, the California Uniform Code and California Civil Code § 1790, *et seq.* (California Song Beverly Act).

96. As a proximate result of the failure of the product to perform as expressly warranted by Defendant, Plaintiff and class members have suffered actual damages in an amount to be determined at trial in that they were induced to a product they would not have purchased

-13-

C:\Documents and Settings Quaker Oats Litigation
COMPLAINT

had they known the true facts about, and have spent money on a product that is not what it was represented to be, and that lacks the value Defendant represented the product had, which was reflected in the purchase price.

97. Plaintiff gave timely notice to Defendant of this breach on behalf of themselves and all members of Plaintiff's class prior to the filing of this Complaint.

98. Plaintiff cannot return the product to Defendant for repair, as the defect is irreparable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the general public, pray for judgment and relief against Defendants as follows:

A. Declaring this action to be a proper class action;

B. An order compelling Quaker to conduct a corrective advertising campaign to inform the public that its products contain unsafe amounts of trans-fat at consumers' actual consumption levels.

C. An order requiring Quaker to disgorge all monies, revenue, and profits obtained by means of any wrongful act or practice;

D. An order compelling Quaker to destroy all misleading and deceptive advertising materials and products as provided by 15 U.S.C. an amount to be determined at trial in that they were induced to a product they would not have purchased had they known the true facts about, and have spent money on a product that is not what it was represented to be, and that lacks the value Defendant represented the product had, which was reflected in the purchase price. 1118;

E. An order requiring Quaker to pay restitution to restore all funds acquired by means of any act or practice declared by this court to be an unlawful, or a violation of the CLRA, plus pre- and post-judgment interest thereon;

F. Costs, expenses, and reasonable attorneys' fees;

G. Any other further relief the Court deems necessary, just, or proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Date:  January 5, 2010                              Respectfully submitted,


                                                    By: _____
                                                          REGINALD TERRELL


                                                    REGINALD TERRELL
                                                    THE TERRELL LAW GROUP
                                                    P. O BOX 13315, PMB # 148
                                                    OAKLAND, CA 94661
                                                    510 237 9700/FAX: 510 237 4616

                                                    DONALD AMAMGBO
                                                    AMAMGBO & ASSOCIATES
                                                    6167 BRISTOL PARKWAY, #325
                                                    CULVER CITY, CA 90230
                                                    Telephone:  310-337-1134
                                                    Facsimile:  310-337-1157

                                                    SYDNEY J. HALL, ESQ., SBN:  158151
                                                    LAW OFFICES OF SYDNEY J. HALL
                                                    1308 Bayshore Highway, Suite 220
                                                    Burlingame, CA 94010
                                                    Telephone:  (650) 342-1830
                                                    Facsimile:   (650) 342-6344

C:\Documents and Settings Quaker Oats Litigation
COMPLAINT

-15-